244 So.2d 37 (1971)
Mrs. Mattie Wilson MORELAND, Plaintiff and Appellant,
v.
Milford Lewis CRAFT and Alpha Clark Craft, Applying for Adoption, Defendants and Appellees.
No. 3292.
Court of Appeal of Louisiana, Third Circuit.
January 15, 1971.
Rehearing Denied February 24, 1971.
Writ Refused April 14, 1971.
*38 Roy S. Halcomb, Ferriday, for plaintiffappellant.
Lloyd F. Love, Ferriday, for defendantsappellees.
Before FRUGE, CULPEPPER and MILLER, JJ.
CULPEPPER, Judge.
Milford Lewis Craft and his wife, Alpha Clark Craft, seek a final decree of adoption of the child, David Earl Ferobin. The application is opposed by Mattie Wilson Moreland, the natural mother of the child. From an adverse judgment, the natural mother has appealed.
The substantial issue is whether the interlocutory decree of adoption was void for lack of continuing consent of the natural mother.
The facts show that the natural mother, whose maiden name was Mattie Mae Wilson, was in foster care until at age 15 she married Doyle Ferobin. After about two years, this marriage was terminated by divorce. The child, David Earl Ferobin, was born on March 10, 1967, and is illegitimate.
At the time the child was born, the mother was working as a waitress at the King Hotel in Ferriday. She testified that since she was financially unable to provide for the child, she began to look for a married couple who would care for it. She first left the child with a family named Hamilton, where it remained for only a few days. Then she met the Crafts and together they went to the Hamilton home where the natural mother reclaimed the child and placed it with the Crafts on May 25, 1967. On the next day, May 26, 1967, she appeared before a Notary Public and signed a written surrender of the child to the Crafts for purposes of adoption.
On June 9, 1967, Mr. and Mrs. Craft filed a petition to adopt the child. Pursuant to the provisions of LSA-R.S. 9:427, the Department of Public Welfare submitted to the court a confidential report, dated October 23, 1967. With reference to the Department's investigation of the availability of the child for adoption, this report states "Mattie Wilson was interviewed by a representative of our Department and at that time did not consent to the adoption of her son."
The facts also show that during October of 1967, the natural mother left Ferriday with Charles Moreland, who was then married but separated from his wife and planning to obtain a divorce. They later moved to Alaska and were living there during the remainder of the proceedings for the interlocutory decree of adoption.
On August 8, 1968, the Crafts filed a supplemental and amended petition, stating that the natural mother's whereabouts were unknown and asking that a curator ad hoc be appointed to represent her. An attorney at law, Roy S. Halcomb, was appointed curator ad hoc. He accepted the appointment, but there is nothing in the record to show whether he was able to contact the natural mother to give her notice of the hearing for an interlocutory decree.
On September 6, 1968, the interlocutory decree was signed by the late Judge Jesse C. Magee, of the Seventh Judicial District.
On January 22, 1970, the Crafts filed a petition for final adoption. The same attorney, Roy S. Halcomb, was appointed curator ad hoc to represent the absent defendant, Mattie Wilson. The curator contacted her by mail in Alaska where *39 she had married Charles Moreland, following his divorce from his previous wife.
Pursuant to the natural mother's instructions, the curator filed an answer, opposing the final decree of adoption on the grounds that she did not consent and that she is now able to care for the child and desires that he live with her. The curator also filed a motion to set aside the interlocutory decree on the grounds that she did not consent thereto. The Crafts filed an exception of no right of action on the grounds that, under LSA-R.S. 9:429, the withdrawal of consent by the natural parent cannot bar a final decree of adoption. These motions were referred to the merits and the case was tried on March 20, 1970.
At the trial the adoptive parents, their other children and several neighbors testified generally that the Crafts live on a 40-acre farm in Tensas Parish. Mr. Craft is employed as a driller in offshore oilfields where he works seven days and then is at home seven days. The family home is modest but adequate and the child is loved and well cared for.
The natural mother testified in her own behalf that although she signed the notarial act of surrender for adoption, she did so because she was financially unable to take care of the child at the time. She says she never intended to surrender the child permanently and that when she was contacted by the Department of Public Welfare before the interlocutory decree she told the investigator that she did not consent to the adoption. Mrs. Moreland also testified that before she went to Alaska with Mr. Moreland she tried several times to get her child back from the Crafts, but they refused and told her she would have to get "A court order."
With reference to her present situation in Alaska, the mother testified that her husband, who is a college graduate, is the manager of a store with an income of about $15,000 a year and they live in an apartment and are well able to care for the child.
The natural mother's father-in-law, Harvey Moreland, a resident of Concordia Parish, corroborated her in certain respects. Mr. Moreland says he knows his son divorced his first wife and married Mattie Wilson and that from pictures and certain correspondence, he knows they now have a happy and stable home.
In a written opinion the district judge concluded that the natural mother knowingly and willingly signed the written consent for adoption by the Crafts. Also, that the notice given to the court through the Department of Welfare that the mother "does not consent", coupled with the mother's statement to the adoptive parents that she wanted them to return her child, did not constitute sufficient withdrawal of consent to void the interlocutory decree. Having reached these two conclusions, the court decided under LSA-R.S. 9:429 and 432, subd. B, that any withdrawal of consent after the interlocutory decree came too late and did not bar a final decree of adoption.
With all due respect, we are unable to agree with the trial judge that the natural mother did not effectively withdraw her consent prior to the interlocutory decree of adoption. The thrust of the district judge's reasoning is that it was incumbent upon the natural mother to file some written withdrawal of her consent or to employ an attorney and oppose the interlocutory decree. Under the circumstances, we cannot agree that such a formal withdrawal of consent was necessary. In our view, the notice to the Department of Public Welfare that she did not consent, together with her efforts to secure the return of her child, were sufficient to withdraw her consent prior to the interlocutory decree. And, since this decree was entered without the consent of the natural parent, it is invalid.
*40 We will next discuss the applicable law. At the outset, we note that in this case the voluntary surrender of the child was to private individuals and not to an agency. Also, there is no decree of abandonment. Hence, LSA-R.S. 9:402 through 404, which provide that surrender to an agency or a decree of abandonment terminate all parental rights, have no application here.
Pertinent here is LSA-R.S. 9:427 which reads as follows:
"The department shall study the proposed adoption and submit a confidential report of its findings to the judge. The findings shall include the conditions with respect to the availability of the child for adoption; the physical and mental condition of the child and other factors regarding the suitability of the child for adoption in petitioner's home; the moral and financial fitness of the petitioner; the conditions of the proposed adoptive home with respect to health, adjustment, and other advantages or disadvantages to the child. If the child has not been legally surrendered or declared abandoned by a court of competent jurisdiction, the department shall make every effort to locate the living parent of the child to determine his attitude toward the proposed adoption."
The source of the above quoted statute is Act No. 228 of 1948, Section 7, which amended the prior statute, Act 154 of 1942. The 1942 Act provided that the Department of Public Welfare locate the parents and obtain the "necessary consent" to the proposed adoption. The 1948 amendment removed the word "necessary" and substituted the provision, quoted in LSA-R.S. 9:427 above, that the Department determine the parent's "attitude toward the proposed adoption."
The first case in point by our Supreme Court after the 1948 amendment was In re Byrd, 226 La. 194, 75 So.2d 331 (1954). The argument was made that under Act 228 of 1948 the consent of the natural parents is no longer an absolute necessity, and that the basic consideration in adoption proceedings is now the best interest of the child. Our Supreme Court rejected this argument and reaffirmed the position which it had previously taken in Green v. Paul, 212 La. 337, 31 So.2d 819 (1947), requiring the continuing consent of the natural parent up to the time of the final decree of adoption. In the Byrd case the court said:
"The appellants lay great stress on the provision of the statute, that the basic consideration of the decree is the best interest of the child. This provision of the statute applies only where the child is available for adoption and then if it is for the best interest for the child to be adopted by the applicants. There has been no material change with respect to the requirement of the continuing consent of the natural parents. The statute requires that the process be served on the natural parents and the determination of the attitude towards the proposed adoption prior to the hearing for an interlocutory decree. It also requires that their attitude to the proposed adoption be again ascertained and if there is any change in the conditions it must be determined before the hearing for the final decree of adoption. This in our opinion requires the continuing consent of the natural parents until the final decree is granted. The statute does not require the consent to be given by notarial act or in any particular form. There is nothing in the statute to indicate that a consent given prior to or at the time the proceedings are instituted have any binding effect. The consent is to be determined at the hearing for an interlocutory decree and the attitude in that respect must be again determined on the hearing for the final decree of adoption. This clearly indicates that the consent must continue until the final decree is rendered."
*41 In Madere v. Long, 231 La. 498, 91 So.2d 771 (1956) our Supreme Court reaffirmed In re Byrd, supra, and Green v. Paul, supra.
By Act No. 268 of 1960, Section 2, the legislature amended the prior adoption law by adding the portion underlined in the following quotation of LSA-R.S. 9:429:
"The judge upon examining the confidential report and upon the parties being interrogated, may grant or refuse an interlocutory decree during or after the hearing hereinabove provided. The clerk of court shall forward a certified copy of the decree to the department. After the interlocutory decree has been granted by the judge, the withdrawal of consent by the legitimate parent or parents, by the mother or by the father who has acknowledged the child by notarial act as provided by Article 203 of the Civil Code, shall not bar a final decree of adoption. As amended Acts 1960, No. 268, § 2." (Italics supplied)
The obvious purpose of the 1960 amendment was to legislatively overrule the cases cited above, insofar as they require the continuing consent of the natural parent after the interlocutory decree. However, the legislature did not change the jurisprudential rule requiring continued consent of the natural parent to the time of the interlocutory decree.
The Crafts rely on certain language in the case of In re Hughes, 176 So.2d 158 (La.App. 4th Cir. 1965), which states that the legislative intent in removing the word "necessary" from the prior adoption statute and substituting therefor by Act 228 of 1948 the requirement that the Department of Public Welfare determine the parent's "attitude" toward the adoption, is to give the district judge a certain amount of discretion to determine whether there has been consent in those situations where the natural parent neither consents nor opposes the adoption. Our answer to this argument is that In re Byrd, supra, and Madere v. Long, supra, were decided by our Supreme Court after the statute was amended and in these cases the court reaffirmed its position that continuing consent is required. Furthermore, the facts of the present case show that this is not a situation where the natural parent neither consents to nor opposes the adoption. Here, the natural parent has expressly withdrawn her consent prior to the interlocutory decree.
The crucial issue in the present case is whether the natural mother's statement to the Welfare Department representative, that she did not consent to the adoption, is sufficient to constitute a withdrawal of her consent prior to the interlocutory decree. We note particularly that the statutes do not provide any special form for either the giving or the withdrawal of consent. LSA-R.S. 9:427 requires only that the Welfare Department investigate the proposed adoption and submit a report to the judge, including certain listed information. Among these are "the availability of the child for adoption" and the parent's "attitude toward the proposed adoption." The statute does not require that the Department secure a written consent or a written withdrawal of any previously given consent. Nor does it require that the natural parent file in the proceedings a written consent, a withdrawal of consent or a formal opposition to the interlocutory decree.
Our jurisprudence is established that adoption statutes are strictly construed in favor of the natural parents. Roy v. Speer, 249 La. 1034, 192 So.2d 554 (1966). Such a construction in the present case leads to the conclusion that the mother withdrew her consent.
Our view is supported in the case of In re Adoption of Gordon, 135 So.2d 673 (La.App. 4th Cir. 1961). In that case the mother consented to the entry of the interlocutory *42 decree, which was granted in 1959, before the 1960 amendment to LSA-R.S. 9:429. However, the court held that her withdrawal of consent after the interlocutory decree barred the granting of the final decree after 1960. In discussing the mother's withdrawal of consent, the court, without extended discussion, said:
"The record reveals that the mother of the child objected to the adoption and desired the return of custody of the child to her, which objections, as far as is shown by the record, were made only to representatives of the Department of Public Welfare, and that these objections were made known to the court prior to the rendition of the final decree." (Emphasis ours)
Having reached the conclusion that the interlocutory decree of adoption is void for lack of continuing consent to the time of that decree, it is unnecessary for us to consider the respective contentions of the parties as to how the best interests of the child will be served.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that the interlocutory decree of adoption rendered on September 6, 1968, is null and void. The petition of Mr. and Mrs. Craft for a final decree of adoption is rejected. All costs in the lower court, as well as the costs of this appeal, are assessed against the Crafts.
Reversed and rendered.
MILLER, Judge (dissenting).
The majority opinion is most persuasive. I think it goes too far in recognizing the rights of a natural parent. I would set certain limits to the reasoning summarized in Roy v. Speer, 249 La. 1034, 192 So.2d 554 (1966) that:
"Ties between parent and child, being the closest and strongest within the human family, courts sever them with extreme reluctance."
"These (adoption) statutes, being in derogation of the natural right of the parents to the child, and the right of the child to its parents, have consistently been strictly construed in the jurisprudence in favor of the parents." 192 So. 2d 554, 557.
This is a case between a natural parent on the one hand and "real" parents on the other. Here the "real" parents have had their child from age 2 months to age 3 years 8 months. This is the only family the child has known. He is and has been a member of the adopting family since May 26, 1967.
There must be some line where the interest of the child must bear more heavily than the right of a natural parent to block an adoption.[1] I think this is the case.
To find that the mother's May 26, 1967 notarial consent to the adoption was revoked, the majority opinion cites only a portion of the Department of Public Welfare's October 23, 1967 confidential report to the trial judge. This report is in the record at the request of both counsel. The quoted statement is negated by the remainder of the report and by the actions of the natural mother.
In determining the availability of the child for the interlocutory decree, the trial judge was obliged to consider the entire report, the notarial consent of record, and the mother's total disinterest in her child for eleven months prior to the September 6, 1968 hearing.
*43 A review of other portions of the report suggests that the mother did not revoke her consent. The report goes on to state:
"Mattie Mae Wilson, age nineteen, was in foster care from age six to fifteen. She left foster care when she married Doyle Ferobin. After two years of marriage the couple separated and were divorced in November, 1966 because of Mrs. Wilson's alleged infidelity. On October 24, 1966, Mrs. Wilson gave birth to her first child, a boy, who was adopted by friends in Mississippi. Mrs. Wilson stated that the father of her second child is a married man from Mississippi that she had been dating. After the child's birth she continued dating this man several months. Mrs. Wilson has been living and working at the King Hotel for some time but on Friday, October 6, 1967, she left Ferriday in the company on one Charles Moreland. Mr. Moreland talked with a representative of this Department and said that he is separated from his wife and plans to go to Nevada to obtain a divorce. He then plans to marry Mrs. Wilson and go to Alaska. Mrs. Wilson wanted to take David Earl with her and Mr. Moreland to Alaska; however, the Crafts said they would not give the child to her without a court order."
The report concludes with this summary:
"Mr. and Mrs. Craft are seeking to adopt a six month old boy who was placed in their home five months ago by his mother. The natural mother does not consent to the adoption; however she has left the state and presumably is on her way to Alaska in the company of a married man. The natural mother has never been very stable herself nor has she made any definite plans for this child."
This report was held by the trial judge from October 23, 1967 until the September 6, 1968 hearing for the interlocutory decree. The mother left on October 7, 1967 and after that date her whereabouts were unknown. In the intervening eleven months the mother did not contact her child. She did not write the Court, the Crafts or the DPW. She had been contacted in early October, 1967 concerning the pending adoption. She told the DPW that the Crafts told her they would not return the child to her "without a court order." Instead of making an effort in this discrection, she disappeared.
The DPW did not know about the mother's notarial consent. This consent was in the record presented at the September 6, 1968 interlocutory hearing and states:
"Before me, the undersigned notary public, appeared MATTIE WILSON who deposed that she is the mother of David Earl Ferobin; that she is aware and knows of her own knowledge that Milford Louis Craft and his wife, Alpha Clark Craft, desire to adopt her son; that she does by these presents waive all formal citation and service in the premises and does hereby request the Court grant the prayer of Milford Louis Craft and his wife, Alpha Clark Craft, and allow them to adopt her said child, as, in her opinion, it would be to the manifest best interest and for the future security of her child that this adoption be granted by the Court."
At the hearing for the interlocutory decree the trial judge must have been impressed by the fact that this mother had allowed her older child to be adopted. This was not her first experience.
The consent was not signed until two months after the child was born. It was signed at a time when the mother was still dating the father of the child.
The report stated that the mother first mentioned wanting the child back in late *44 September, 1967. "On one occasion Mrs. Wilson called and asked the Crafts for money which they refused to give her."
At the 1970 trial, the mother denied that she understood that the March 26, 1967 notarial instrument was a consent and a request that the Court allow the Crafts to adopt her child. But she readily admitted that she understood the identical wording in an instrument she signed before the same Notary Public three days earlier consenting to the adoption of her son by another family. Tr. 118.
To summarize, it was established in this record that: 1) The mother knew what she was signing when she signed the notarial consent for the Crafts to adopt her son. 2) The mother had permitted an older child to be adopted. 3) The mother knew that the adoption proceeding was pending. 4) The mother knew that the Crafts would not return her child unless she obtained a court order. 5) With this knowledge, the mother left on October 6, 1967 without taking steps to revoke her freely given consent to the adoption, and without leaving a forwarding address. 6) For the following eleven months, she did not contact her child, the Crafts or the Court.
On September 6, 1968 and on this record the trial judge had to evaluate the statement in the DPW's confidential report which stated: "The natural mother does not consent to the adoption; however she has left the state and presumably is on her way to Alaska in the company of a married man. The natural mother has never been very stable herself nor has she made any definite plans for this child." (Emphasis added.)
The law does not particularize the method for a parent to consent or withdraw consent. I respectfully suggest that there is no manifest error in the trial court's finding that the mother's notarial consent had not been withdrawn.
Furthermore, this will record my objection to setting aside an interlocutory decree of adoption based primarily on a statement in the DPW's confidential report to the trial judge. The public review of these confidential reports will reduce their effectiveness.
All adoptions based on a direct placement by the natural parents are placed in jeopardy. Many cases may be reopened to review the confidential report made to the trial judge. If the DPW report shows an idle statement by the mother to the effect that she did not approve (even though her actions show she didn't mean it), and if on one occasion the mother sought the return of her child, the adoption may be set aside.
Some DPW employees take the position that children should be voluntarily surrendered to the Department for adoption rather than placed by the parent in a specific home for adoption. When a child is voluntarily surrendered to the DPW, the mother does not have the right to revoke her consent. LSA-R.S. 9:402. Is it possible that the natural parents might be encouraged to make a statement that they are withdrawing their consent in order to effectively prevent private placements?
The decision to grant the interlocutory decree is supported by the record. I would affirm the trial court.
Rehearing denied.
MILLER, J., votes for rehearing.
NOTES
[1] The majority opinion does not award custody to the natural mother. The trial court must decide the custody question.