378 So.2d 1030 (1979)
Wanda Lynn ALLEN, Plaintiff-Appellant,
v.
The VOLUNTEERS OF AMERICA, Defendant-Appellee.
No. 13980.
Court of Appeal of Louisiana, Second Circuit.
December 3, 1979.
Rehearing Denied January 9, 1980.
Writ Refused March 3, 1980.
James E. Franklin, Jr. and Donald C. Brown, Shreveport, for plaintiff-appellant.
Roy L. Beard and Booth, Lockard, Jack, Pleasant & Lesage, by Henry A. Politz, Shreveport, for defendant-appellee.
Before HALL, MARVIN and BIGBY, JJ.
En Banc. Rehearing Denied January 9, 1980.
MARVIN, Judge.
In this habeas corpus action, the plaintiff mother of an illegitimate child appeals a judgment rejecting her demands to set aside a formal act of surrender of the infant to the defendant adoption agency 7½ months before the action was filed on the grounds that her consent was obtained by threats and duress. La.C.C. Arts. 1797-1819, 1850-1853, 1859. We affirm. Golz v. Children's Bureau of New Orleans, Inc., 326 So.2d 865 (La.1976).
The defendant is a licensed agency within the meaning of LRS 9:401. The surrender and the placement of the child was made under state supervision in accord with law. In cases involving private, non-licensed agencies, consent by a mother to the adoption of her illegitimate child may be withdrawn at any time before the interlocutory decree is signed. LRS 9:427; Moreland v. Craft, 244 So.2d 37 (La.App. 3d Cir. 1971). In agency cases, the formal act of surrender is permanent (LRS 9:402) and irrevocable, if there is no vice of consent. Golz, supra. Once formally given without any vice, consent need not continue and a change of mind afterward is immaterial. See Ball v. Campbell, 219 La. 1076, 55 So.2d 250 (1951); In Re Adoption of Giambrone, 262 So.2d 566 (La.App. 4th Cir. 1972).
*1031 Plaintiff does not claim that any pressure, duress or undue influence was exerted by the agency or its representatives. She claims that her consent was vitiated because during the last 4½ months of her pregnancy, her father told her that she had embarrassed her family, that she had excited her mother's ulcers and his blood pressure, that if she attempted to live with her grandmother he would force a sale of the grandmother's farm, and that he would not allow her to resume living at home unless she surrendered the child for adoption.
On June 4, 1978, plaintiff, a 19-year-old pregnant college coed, was admitted for resident pre-natal care at the agency home. Periodic counseling and discussions between the agency and plaintiff about the surrender of the child for adoption began almost immediately. The child was born September 14. The formal act of surrender was executed September 21. On September 22 plaintiff moved from the agency home to reside with her parents, about 100 miles away from the agency home. About two months later, plaintiff moved to the home of her paternal grandmother in another parish. On two occasions during the six weeks following the birth of the child, plaintiff visited at the agency home. Soon after birth, the child was formally placed with prospective adoptive parents who instituted adoption proceedings before plaintiff filed this action. LRS 9:401 et seq.
The case file maintained by the agency contains transcriptions of notes and dictation made on a day-to-day basis while plaintiff was in the agency home. It was transcribed and completed about the time plaintiff left the home. Plaintiff and several members of her family testified. The testimony and the transcription contained in the case file support the lower court's conclusions and the conclusions summarized here.
Her paternal grandmother and aunt counseled plaintiff to keep the child, contrary to her father's wishes.
Upon plaintiff's admission to the agency home, the agency realized plaintiff "does need time to think this [adoption] over" and that plaintiff was "undecided" as to her plans for adoption when she was admitted on June 4.
On June 6 plaintiff decided that she would inform her father she planned to permit adoption.
After July 12, plaintiff changed her mind and was giving serious thought about keeping her child after having been contacted by her grandmother, who offered to immediately provide shelter and support for plaintiff, her delivery, the rearing of the child, and plaintiff's college education. Plaintiff said she has not been able to [calmly] discuss this with her father as he absolutely refuses to discuss her predicament and has given her no room to make a decision on her own.
The agency and plaintiff discussed "a great deal about the pros and cons in raising a child in a one-parent family." Literature about adoption was given to plaintiff during her residence at the agency home.
Plaintiff attended several meetings about adoption and asked pertinent questions during her stay. She privately discussed the decision facing her with agency counsellors.
Plaintiff was in telephone contact with her grandmother, aunt, and her family during her stay and was personally visited by a female friend, her father and her sister. Plaintiff was free to contact anyone and to leave the home, if she desired.
Plaintiff telephoned to wish her father happy birthday on August 29 and was told by him that he wants what is best for her, that he will accept whatever she does, even though it will hurt him "further" if she decides to keep the child.
About a week later, plaintiff announced that she has decided to permit adoption and that she has been "pulling against her father" simply to make her point.
Before the birth of the child, plaintiff said she had told her parents and her grandmother about her decision to permit adoption. Her grandmother was "not real receptive" about plaintiff's decision. Her parents "seemed very happy".
*1032 On the day of or the day after the birth of the child, plaintiff informed the agency to schedule the formal surrender on September 21.
All formalities respecting the signing of the authentic act of surrender were observed. A copy of the surrender form had been given to plaintiff a day or two before. Plaintiff was told to read it and be sure of her decision because that decision would be final. Plaintiff was asked by the notary to read the act before she signed it. The notary (an attorney at law) discussed with plaintiff the contents and the effect of the instrument, emphasizing its effect, its finality and irrevocability. She acknowledged several times that she understood. She did not mention, and was not asked about, any pressure from or problems with her father.
Plaintiff did not mention any change of mind to anyone upon the occasion of her two post-partum visits to the agency which occurred before December 1.
She and her grandmother began to seek legal advice, however, shortly after plaintiff moved from her parents' home to her grandmother's home about December 1.
The emotions of plaintiff and her concerned relatives were intensified. Plaintiff's relatives expressed strongly-felt and competing advice to plaintiff during her pregnancy. Plaintiff's vacillation about her decision proves her torment. It does not prove that her consent was legally vitiated. Plaintiff's torment was caused by her realization of the significance of the decision she would make because the factors weighing for and against surrender were repeatedly stated to her by competing relatives. More importantly, these things prove that plaintiff's eventual decision, however agonizing, was the free exercise of her own volition, not tainted by any vices of consent. CC Art. 1819.
Plaintiff's ultimate decision to surrender her child for adoption continued from about September 1 through the date of formal surrender on September 21 and until she moved in with her grandmother. Her decision, either way, however, was not one which could be easily made and forgotten. Before and after she made her ultimate decision she had misgivings about whether it was the "right" decision because she knew that lives other than her own would be affected. According to agency testimony, vacillation and torment over such a decision is expected and is usually demonstrated by an unwed mother. Plaintiff's awareness of these factors belies the contention or the finding that her consent was legally vitiated at the time of the surrender and during the two or three week period immediately before. There is simply no evidence of any undue pressure, threat, or coercion being exercised upon her during this period, or that her ultimate decision was the product of earlier threats or coercion, even assuming arguendo that the conduct and remarks of plaintiff's father amounted to threats and coercion.
Except as here modified, for reasons stated below and summarized here, at appellant's cost, judgment is
AFFIRMED.